IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:19-CV-93-RJ

CHRISTY L. LILLEY,

              Plaintiff/Claimant,

v.

ANDREW SAUL,
Commissioner of Social Security,

              Defendant.

O R D E R

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-26, -27] pursuant to Fed. R. Civ. P. 12(c). Claimant Christy L. Lilley ("Claimant"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, Claimant's Motion for Judgment on the Pleadings is denied, Defendant's Motion for Judgment on the Pleadings is allowed, and the final decision of the Commissioner is affirmed.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on September 1, 2016, alleging disability beginning May 30, 2010. (R. 57, 222–28). Her claim was denied initially and upon reconsideration. (R. 57, 124–56). A hearing before the Administrative Law Judge ("ALJ") was held on February 5, 2018, at which Claimant, represented by a counsel, and a

vocational expert ("VE") appeared and testified. (R. 57, 77–123). On August 22, 2018, the ALJ issued a decision denying Claimant's request for benefits. (R. 54–76). The Appeals Council denied Claimant's request for review on March 1, 2019. (R. 22–27). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

2

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy that the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant contends (1) new evidence demonstrates she is disabled and entitled to benefits; (2) the ALJ failed to sufficiently consider the severity of her impairments; (3) the ALJ improperly determined Claimant's degenerative disc disease and mental health impairments did

3

not meet a listing; (4) the ALJ improperly weighed opinion evidence from Claimant's treatment providers; and (5) the ALJ improperly assessed Claimant's testimony. Pl.'s Mot. [DE-26].

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful activity from May 30, 2010, the alleged onset date, through September 30, 2016, her date last insured. (R. 59). Next, the ALJ determined Claimant had the severe impairments of degenerative disc disease, depression, and anxiety and the non-severe impairments obesity and carpal tunnel syndrome. *Id.* At step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 60–61). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in understanding, remembering, or applying information and adapting and managing oneself and moderate limitations in concentrating, persisting, or maintaining pace and interacting with others. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform medium exertion work[1] with the following limitations:

> The claimant could frequently climb ramps and stairs; and could frequently stoop. She could perform goal-oriented rather than production-oriented work (i.e., the performance of work tasks in allotted time is more important than the pace at which the work tasks are performed). The claimant could perform simple, routine work (i.e., requires little or no judgment, requires little specific vocational preparation and could be learned on the job within 30 days, does not provide work skills, and has no more than frequent changes in essential work duties). She could have occasional contact with the general public with superficial interaction (speaking with the public is not an essential component of the job). She could have frequent

---

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, she can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

4

contact with coworkers with superficial interaction (exclude work that requires collegial work effort).

(R. 62–68). In making this assessment, the ALJ found Claimant's statements about the intensity, persistence, and limiting effects of her symptoms were not fully consistent with other evidence in the record. (R. 63). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of any past relevant work. (R. 68). Nonetheless, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined Claimant was capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 68–71).

## V. DISCUSSION

### A. New Evidence

Claimant contends that new evidence in the form of a June 2019 Medicaid decision awarding benefits effective February 2018, [DE-5-1], demonstrates Claimant is disabled and entitled to SSA benefits. Pl.'s Mot. [DE-26] at 1. Claimant also provided the court with the following medical records that were not presented to the ALJ or Appeals Council: a PORT Health Services ("PORT") medication log from December 20, 2016 to December 10, 2018, [DE-5-2] at 31; a PORT appointment log from December 7, 2016 to August 19, 2019, *id.* at 32–36; treatment notes from December 13, 2017 and December 10, 2018 from PORT, *id.* at 37–53; laboratory test results from December 20, 2016 to August 21, 2018 from PORT, *id.* at 54–85; a December 11, 2018 Physical Residual Functional Capacity Statement, [DE-5-3]; a copy of Claimant's disability parking placard, [DE-5-4] at 2; third-party statements from five of Claimant's friends, [DE-5-8]; and a November 8, 2016 opinion from Ruth Cox, PhD at LeChris Health Systems ("LeChris"),

5

[DE-5-9].[2]

When evidence was not before the Commissioner and is provided to the court for the first time, remand is warranted upon a showing that the "new evidence" is "material" and that there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding [.]" 28 U.S.C. § 405(g); *Barber v. Berryhill*, No. 7:16-CV-361-FL, 2018 WL 1311998, at *4 (E.D.N.C. Feb. 14, 2018), *adopted by* 2018 WL 1129970 (E.D.N.C. Mar. 1, 2018). To obtain a sentence-six remand, a claimant must satisfy four requirements:

> First, the claimant must demonstrate that the new evidence is relevant to the determination of disability at the time the claimant first applied for benefits and is not merely cumulative of evidence already on the record. *Borders v. Heckler,* 777 F.2d 954, 955 (4th Cir. 1985) (citing *Mitchell v. Schweiker,* 699 F.2d 185, 188 (4th Cir. 1983)). Second, the claimant must establish that the evidence is material, in that the Commissioner's decision "'might reasonably have been different' had the new evidence been before her." *Id.* (quoting *King v. Califano,* 599 F.2d 597, 599 (4th Cir. 1979)). Third, the claimant must show that good cause exists for her failure to present the evidence earlier. *Id.* And fourth, the claimant must present to the reviewing court "'at least a general showing of the nature' of the new evidence." *Id.* (quoting *King,* 599 F.2d at 599).

*Finney v. Colvin*, 637 F. App'x 711, 715–16 (4th Cir. 2016).

### 1. The Medicaid Decision

The Medicaid decision was first submitted to the agency, after the Appeals Council denied review, as part of a request for an extension of time to file a case in the district court. (R. 10–15). Because the Medicaid decision post-dated both the ALJ's and the Appeals Council's decisions, Claimant could not have presented the evidence in time for the ALJ or Appeals Council to consider it, and Claimant submitted a copy the Medicaid decision to the court, satisfying the third and fourth requirements. However, given the date of the Medicaid decision, the evidence cited in it, and the

---

[2] Claimant also attached other documents to her complaint that were already a part of the administrative record and were considered by the ALJ or Appeals Council. [DE-5-2] at 4–28; [DE-5-4] at 1; [DE-5-5]; [DE-5-6]; [DE-5-7]; [DE-5-10].

6

evidence considered by the ALJ, Claimant has failed to demonstrate that the new evidence relates to the disability period at issue or is material such that the Commissioner's decision might reasonably been different had the Medicaid decision been considered.

After a hearing on May 1, 2019, a State Hearing Officer with the North Carolina Department of Health and Human Services determined on June 14, 2019 that Claimant was disabled and entitled to Medicaid, effective February 2018. [DE-5-1]. The State Hearing Officer found in relevant part, pursuant to 20 C.F.R. §§ 416.920 and 416.945, that Claimant had the severe impairments of borderline personality disorder, bipolar I disorder with psychotic features, generalized anxiety disorder, post-traumatic stress disorder, mass effect on exiting, sciatica, back injury, neck injury, pinched nerves, carpal tunnel syndrome, and arthritis; Claimant had the RFC to engage in sedentary work at a non-rapid pace, in a low-stress environment, and have non-intensive interaction with coworkers or the general public; and Claimant met the disability requirements under Vocational Rule 201.14, which directs a finding of disability. [DE-5-1] at 3. The State Hearing Officer also determined that "the effective date of eligibility must be no longer than the third month before the month of application if the [claimant] would have been eligible for Medicaid at that time." *Id.* at 3–4. Claimant submitted her Medicaid application on May 23, 2018, and was deemed eligible in February 2018, the third month before the month of application. *Id.* at 1, 3–4.

The disability period at issue in this case is from May 30, 2010, Claimant's alleged onset date, through September 30, 2016, Claimant's date last insured. (R. 57). The favorable Medicaid decision was issued on June 14, 2019, more than two years after Claimant's date last insured, and its effective date of February 2018 is sixteen months after Claimant's date last insured. Aside from radiology imaging from November 2014, which the ALJ considered (R. 64), the Medicaid decision

7

cites post-DLI evidence. *See* [DE-5-1] at 2 (citing a December 2017 psychological assessment, November 2018 physical therapy records, and a March 2019 physical assessment). It does not appear the December 2017 psychological assessment, November 2018 physical therapy records, or March 2019 physical assessment were presented to the ALJ or the Appeals Council, but the December 2017 psychological assessment was included with Claimant's complaint filed in this case. [DE-5-2].

When a claimant is seeking DIB, the law requires both a finding of disability and that the claimed disability began before the expiration of insurance coverage. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a); *Johnson v. Barnhart*, 434 F.3d 650, 655–56 (4th Cir. 2005). However, the Fourth Circuit has held that post-DLI records "may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012) (citing *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987)). Here, the Medicaid decision is not material because it was issued well after Claimant's DLI, and there is not sufficient evidence to show linkage between the Claimant's later condition and her pre-DLI condition. *Id.* at 341.

With respect to Claimant's musculoskeletal complaints, the ALJ discussed imaging from November 2014, January 2015, June 2015, and June 2017, noting that the findings were relatively mild and not acute, and he also discussed a January 2016 nerve conduction study that was normal. (R. 64–65). In December 2016, Claimant attended physical therapy three times then missed four appointments and was discharged for non-compliance. (R. 602–16). Although Claimant testified at the February 5, 2018 administrative hearing that she would probably need back surgery, (R. 96), a November 21, 2017 treatment note submitted to the Appeals Council stated that in August 2017, a neurosurgeon determined Claimant was not a surgical candidate and recommended physical

8

therapy, which Claimant declined. (R. 41). The ALJ noted that there were references throughout the record that Claimant's complaints exceeded objective evidence and her physical examinations were largely normal. (R. 64–65); *see, e.g.*, (R. 331 – November 24, 2014 treatment note indicating Claimant was non-compliant with the examination and continued to claim symptoms inconsistent with objective findings); (R. 431 – December 2015 treatment note stating that there were "no 'red flags' or imaging findings that would explain her complaints of pain over entire body"); (R. 590 – January 2017 treatment note stating Claimant had minimal diagnostic findings, and she had not tried many conservative options).

The Medicaid determination appears to rely largely on physical therapy records from November 2018 and a physical examination from March 2019, which indicated Claimant had an antalgic gait; moderate difficulties lifting, carrying, bending, squatting, and communicating; and needed a walker for ambulation. [DE-5-1] at 2. The ALJ noted a March 2017 treatment note indicating Claimant was using a walker and had a slowed gait but also noted that on examination Claimant could move all her extremities without difficulty and her strength and tone were normal in all muscles. (R. 65, 573–77). Although Claimant testified she began using a walker in 2015, (R. 94), there is no evidence in the record indicating Claimant used a walker prior to her September 30, 2016 DLI. (R. 449, 582, 585 – June 2016, Jan. 2017, and Feb. 2017 treatment notes indicating Claimant does not ambulate with an assistive device); (R. 547 – Jan. 2016 examination finding that Claimant's gait was smooth and reciprocal). It is not enough that Claimant's condition deteriorated post-DLI where there is ample evidence during the period at issue and in the months following to support the ALJ's decision that Claimant was not disabled prior to her September 30, 2016 DLI. *See Mercer v. Saul*, No. CV 6:18-2915-JMC-KFM, 2019 WL 8953201, at \*12 (D.S.C. Oct. 22, 2019) (finding restrictions imposed several years after the relevant period and after

9

claimant's condition further deteriorated were not proper considerations because "[t]he plaintiff's alleged deterioration after his date last insured is not an appropriate basis on which to award benefits []."), *adopted by* 2020 WL 1080443 (D.S.C. Mar. 6, 2020).

With respect to Claimant's mental impairments, the State Hearing Officer found Claimant was required to work at a non-rapid pace, in a low stress environment, and have only non-intensive interaction with coworkers or the general public. [DE-5-1] at 3. The ALJ similarly limited Claimant to simple, routine work; only superficial interaction with the public and coworkers; and goal-oriented as opposed to production-oriented work.[3] (R. 62). Because the RFC limitations imposed by the ALJ to accommodate for Claimant's mental impairments were consistent with those found by the State Hearing Officer in the Medicaid decision, there is no reason to believe the Medicaid decision would change the ALJ's decision. Furthermore, it was the limitation to sedentary work, not the additional non-exertional limitations, that resulted in a favorable Medicaid determination under Vocational Rule 201.14. [DE-5-1] at 3.

Accordingly, the Medicaid decision is not new evidence meriting remand because it does not relate to the disability period at issue and is not material such that the Commissioner's decision might reasonably have been different had the Medicaid decision been considered.

---

[3] "Non-production jobs" are often equated with low stress jobs in this context. *See Sizemore v. Berryhill*, 878 F.3d 72, 79 (4th Cir. 2017) (noting the ALJ's finding that the claimant "can work only in [a] low stress [setting] defined as non-production jobs [without any] fast-paced work [and] with no public contact."); *Nakia Tanisha W. v. Saul*, No. CV TMD 19-1134, 2020 WL 2198092, at *1 (D. Md. May 5, 2020) (noting the RFC restricted the claimant to "a low stress environment, defined as no strict production quotas, with only occasionally interacting with the public, coworkers, and supervisors."); *Jones v. Saul*, No. CV 8:18-2586-BHH, 2020 WL 1316532, at *3 (D.S.C. Mar. 20, 2020) (noting the RFC restricted the claimant to "a low stress work environment (defined as being free of fast-paced or team-dependent production requirements)").

10

### 2. Other New Records

Claimant provided the court with the following medical records that were not presented to the ALJ or Appeals Council: a PORT medication log from December 20, 2016 to December 10, 2018, [DE-5-2] at 31; a PORT appointment log from December 7, 2016 to August 19, 2019, *id.* at 32–36; treatment notes from December 13, 2017 and December 10, 2018 from PORT, *id.* at 37–53; laboratory test results from December 20, 2016 to August 21, 2018 from PORT, *id.* at 54–85; a December 11, 2018 Physical Residual Functional Capacity Statement, [DE-5-3]; a copy of Claimant's disability parking placard, [DE-5-4] at 2; third-party statements from five of Claimant's friends, [DE-5-8]; and a November 8, 2016 opinion from Ruth Cox, PhD at LeChris, [DE-5-9]. These records do not justify a sentence-six remand.

None of the new evidence predates Claimant's September 30, 2016 DLI, and it does not otherwise demonstrate that Claimant was disabled prior to her DLI. For example, treatment notes from December 13, 2017 and December 10, 2018 from PORT, [DE-5-2] at 37–53, are largely consistent with the earlier treatment notes from PORT considered by the ALJ, (R. 651–70). The ALJ found that Claimant's presentation at Port was not consistent with the longitudinal record and that she overstated her limitations, (R. 66); thus, it is highly unlikely the Commissioner's decision would have changed even if these records were considered. With respect to the November 8, 2016 opinion from Ruth Cox, PhD at LeChris, [DE-5-9], which predates the ALJ's decision, and the statements from Claimant's friends, [DE-5-8], Claimant failed to show good cause why this evidence was not presented earlier. Accordingly, the new records presented for the first time to the court do not merit remand because they do not relate to the disability period at issue, are not material such that the Commissioner's decision might reasonably have been different had they been considered, or there was no showing of good cause for failure to submit them earlier.

11

## B. The ALJ's Consideration of Claimant's Severe Impairments

Claimant contends the ALJ did not sufficiently consider her severe obesity and mental illness by ignoring evidence of her prescription for a walker and her diagnoses of bipolar disorder, mixed/rapid cycling with psychotic features (hallucinations and delusions); borderline personality disorder; and PTSD. Pl.'s Mot. [DE-26] 1, 3–8, 15–16.

First, under S.S.R. 02-1p, obesity will be considered in determining whether a claimant has a medically determinable impairment; whether the impairment is severe; whether the impairment meets or equals a listing; and whether the impairment prevents the claimant from doing work. S.S.R. 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002). At step two the ALJ determined Claimant's obesity was non-severe because it had not resulted in significant functional limitations. (R. 59). The ALJ indicated he considered Claimant's obesity in combination with her severe impairments and in assessing her RFC but did not specifically discuss obesity when formulating the RFC. (R. 59, 62–68).

While the record contains references to the fact that Claimant is obese, there is no evidence regarding the extent to which Claimant's obesity impacted her other conditions or functioning. *See Condon v. Berryhill*, No. 5:16-CV-950-FL, 2018 WL 1542235, at *3 (E.D.N.C. Mar. 29, 2018) (concluding the ALJ's failure to include obesity in the analysis was harmless error because there was no evidence in the record to support a finding that plaintiff's obesity exacerbated or imposed any limitations on her abilities and thus no way to demonstrate plaintiff was prejudiced by the error). The ALJ acknowledged Claimant's obesity and indicated he considered it in formulating the RFC, (R. 59), and to the extent his analysis is lacking, the error is harmless where the record fails to demonstrate how obesity further limited Claimant's abilities beyond the RFC determined by the ALJ. *See Winstead v. Saul*, No. 5:19-CV-210-FL, 2020 WL 1670743, at *8 (E.D.N.C. Mar.

12

16, 2020) (finding any error in considering the claimant's obesity was is harmless where the record failed to demonstrate how obesity further limited the claimant's abilities beyond the RFC determined by the ALJ), *adopted by* 2020 WL 1668048 (E.D.N.C. Apr. 3, 2020).

Next, with regard to Claimant's use of a walker, as the court explained above, there is no evidence aside from Claimant's testimony that she used a walker prior to her September 30, 2016 DLI; in fact, the medical records contradict her testimony that she began using a walker in 2015. (R. 65, 94, 449, 582, 585 – June 2016, Jan. 2017, and Feb. 2017 treatment notes indicating Claimant does not ambulate with an assistive device). The ALJ determined Claimant's degenerative disc disease was a severe impairment and considered it in formulating her RFC. (R. 59, 64–65, 67–68). The ALJ also determined that Claimant's walker was not "medically required," (R. 67–68), and Claimant has not provided any documentation to contradict this finding. Accordingly, the ALJ sufficiently considered Claimant's use of a walker in assessing the severity of her physical impairments during the relevant period.

Finally, with respect to Claimant's mental impairments, the diagnoses Claimant contends the ALJ ignored were outside the relevant period. The ALJ found Claimant's depression and anxiety were severe impairments and considered them in formulating her RFC. (R. 59, 65–67). The ALJ noted mentions of depression and anxiety in Claimant's medical records from 2011 and 2012 and that Claimant began mental health treatment at LeChris in October 2015 where she was diagnosed with adjustment disorder with mixed anxiety and depressed mood. (R. 65, 526). The ALJ accurately summarized Claimant's treatment at LeChris as follows:

> The claimant episodically sought treatment at Le Chris Counseling from October 2015 to November 8, 2016. In November 2015, she was observed to be anxious with abnormal recent memory and poor but socially acceptable judgment. However, her speech, thought process, and thought content was normal. On August 22, 2016, she reported that her main issue is her back pain. She was described as

13

attentive, friendly and her affect was appropriate. Cognitive functioning and fund of knowledge were intact, as well as her short and long term memory. Her insight into her problems appear fair and there were no signs of anxiety. (Exhibits 8F and 19F).

Mental records from after the claimant's date last insured show that she was seen on November 8, 2016, she was described as friendly and requesting a letter stating that she cannot work. She was described to have a constricted/blunted affect but there were no signs of depression or mood elevations. There were also no signs of hallucinations and her associations were intact. The remainder of her mental treatment records come from Port Health Services . . . .

(R. 65, 531–39, 703–04). Furthermore, at Claimant's August 2016 visit, it was noted she would continue with the current medications she had even thought she had not been seen since February 2016, which implies she had not been taking her medications as prescribed, and at Claimant's November 2016 visit, she indicated she wanted to see a psychiatrist and would probably not come back to LeChris. (R. 538, 703).

It was not until Claimant began treatment at PORT in December 2016, that she began to report extreme psychological symptoms, including having up to 100 panic attacks a day, and she was initially assigned diagnoses of Borderline Personality Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, Alcohol Use Disorder, and Cannabis Use Disorder based on her self-reporting. (R. 65–66, 653–61). The ALJ also noted that Claimant reported hallucinations, paranoia, depression, anxiety, and suicidal ideations during her treatment at PORT, although a December 2016 psychological evaluation reflects that Claimant was potentially over reporting her symptoms for secondary gain and that she reported an "INCREDIBLE PLETHORA OF [SYMOTOMS] PRETTY MUCH DEFIES CREDIBILITY." (R. 65–66, 663–70). At Claimant's April 2017 visit she "launche[d] into [an] unusually vague list of diffuse complaints" and complained that her medications were not doing anything. (R. 663). Claimant's precise diagnoses at PORT changed somewhat over 2017 but generally reflected forms of borderline personality

14

disorder, bipolar disorder, panic disorder, and cannabis and alcohol abuse, and she was generally treated with varying doses of Paxil and Latuda, although she reported no improvement with these medications. (R. 651–70). The ALJ found that Claimant's presentation at Port was not consistent with the longitudinal record and that she overstated her limitations. (R. 66).

Claimant takes issue with the ALJ's failure to discuss her diagnoses of bipolar and borderline personality disorders and PTSD. It does not appear Claimant was diagnosed with PTSD by LeChris or PORT in the records before the ALJ, (R. 512–39, 651–70, 703–04), despite her self-report of that diagnosis, (R. 653). As for bipolar and borderline personality disorders, these were diagnosed at PORT after Claimant's September 30, 2016 DLI. The ALJ sufficiently explained why he found Claimant's presentation at PORT to be inconsistent with her presentation at LeChris during the relevant period, (R. 65–66), and it is not the court's role to re-weigh evidence, *Mastro*, 270 F.3d at 176 (citing *Craig*, 76 F.3d at 589). While Claimant now contends she was not honest with her treatment providers at LeChris and only accurately reported her symptoms once she started care at PORT, Pl.'s Mot. [DE-26] at 4–5, the record does not support Claimant's post-hoc rationalization. For example, Claimant stated in her motion that at her last visit to LeChris in November 2016, she was in an "uncontrollable state" and that despite her protests she would not be seen at LeChris again. *Id.* However, the treatment note from LeChris indicates Claimant's examination was relatively normal that day. (R. 703). She was noted to be friendly, flat, attentive, communicative, tense, and anxious with normal speech and mood and no signs of psychotic process. *Id.* Claimant also told her provider she would not likely be back to LeChris because she wanted to see a psychiatrist. *Id.* The record does not support that Claimant's mental impairments were as severe as she alleges during the relevant period. Accordingly, the ALJ sufficiently considered the severity of Claimant's mental impairments.

15

## C.   The ALJ's Listing Determination

Claimant contends the ALJ improperly determined her degenerative disc disease and mental health impairments do not meet a Listing. Pl.'s Mot. [DE-26] at 1, 6. The ALJ considered whether Claimant's musculoskeletal and mental impairments met Listings 1.04, 12.04, and 12.06 and found the criteria for these listings were not met. (R. 60–61).

The Listings consist of impairments, organized by major body systems, that are deemed sufficiently severe to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525(a). Therefore, if a claimant's impairments meet or medically equal a listing, that fact alone establishes that the claimant is disabled. *Id.* § 404.1520(d). An impairment meets a listing if it satisfies all the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); S.S.R. 83-19, 1983 WL 31248, at *2 (Jan. 1, 1983) (rescinded in part). The burden of demonstrating that an impairment meets a listing rests on the claimant. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

When "there is at least conflicting evidence in the record" as to whether a claimant satisfies a listing, the ALJ must explain his determination that the claimant's impairment does not meet or exceed the listing. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). The ALJ cannot "summarily conclude" that a listing is not satisfied because "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* For example, in *Radford* the record showed "limited motion of the spine on at least four occasions, positive straight leg raises at least five times, and sensory reflex loss on at least three occasions," but it also showed "no weakness, sensory loss, or limitation of motion during some examinations." *Id.* at 296. The court held that there was conflicting evidence requiring detailed explanation from the ALJ. *Id.*

16

### 1. Disorders of the Spine, Listing 1.04

To satisfy Listing 1.04A, a claimant must show a disorder of the spine "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord" with one of the following three characteristics:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

> or

> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

> or

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, subpt. P, app. 1, § 1.04.

The ALJ discussed Listing 1.04 as follows:

> The claimant's degenerative disc disease has not resulted in compromise of a nerve root or the spinal cord. In addition, there is not sufficient evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitations of range of motion of the spine, or motor loss (atrophy associated muscle weakness, or muscle weakness) accompanied by sensory or reflex loss. Furthermore, a review of the claimant's medical imaging studies and treatment notes clearly reflect that the criteria of Listing 1.04 are unmet. In addition, there has been no diagnosis of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication that would provide alternative grounds to consider 1.04.

(R. 60).

17

Claimant appears to rely on the results of her imaging studies, obesity, and use of a walker to demonstrate her degenerative disc disease meets Listing 1.04. Pl.'s Mot. [DE-26] at 1, 12–16. A January 2015 MRI of the lumbar spine showed Claimant "really does not have much in the way of bulging discs or foraminal stenosis in the neck," although there was a "slight compression of the exiting L5 root." (R. 345–47). On examination, Claimant had slightly decreased reflexes in both upper and lower extremities, some pain with Spurling maneuver, pain and radicular findings with straight leg raise bilaterally, and reasonably good range of motion of the neck with no instability. (R. 342). A February 2015 MRI of the thoracic spine showed a "small left-sided disc protrusion at T5-T6, without significant mass effect," (R. 488), which her doctor characterized as "a very small disc bulge at T5/6 without central or foraminal stenosis." (R. 360). A December 2015 surgical consultation noted no "red flags" or imaging findings to explain Claimant's complaints of pain over her entire body; for completeness, a nerve conduction study was ordered, which was normal; and MRIs of the lumbar and cervical spine that showed no significant disc protrusion, abutment, or stenosis. (R. 420–23, 431, 441, 443). A January 2017 treatment note indicated minimal diagnostic findings, and on examination Claimant demonstrated no limitation on range of motion in the cervical spine, pain with Spurling maneuver, equal and symmetric reflexes in upper limbs, limited range of motion due to pain in the lumbar spine (however, it was noted that after the exam she bent over to pick up her clothes without any issues), normal strength despite poor effort on exam, and no focal weakness. (R. 588–89, 590). An August 2017 MRI of the thoracic and lumbar spine, done after Claimant had a fall, showed two rib fractures, slight progression of mild thoracic spondylosis, no significant thoracic canal or foraminal stenosis, a small right foraminal disc protrusion without impingement, and mass effect on the exiting left L5 and bilateral descending S1 nerve roots. (R. 592–93). A November 2017 treatment note indicated

18

that the neurosurgeon determined Claimant was not a surgical candidate and recommended physical therapy, which she declined, and Claimant had fallen again while riding her bike and wanted another MRI. (R. 41). The ALJ considered Claimant's imaging and treatment records both before and after her DLI, (R. 64–65, 67), and they support the ALJ's conclusion that Claimant's degenerative disc disease did not meet the requirements of Listing 1.04. Claimant's obesity and use of a walker do not change the result because the ALJ considered them both, there is no evidence regarding the extent to which Claimant's obesity impacted her other conditions or functioning, and Claimant's walker was neither medically necessary nor used prior to her DLI and she does not meet the other requirements of Listing 1.04C. Accordingly, the ALJ did not err in finding Claimant's musculoskeletal impairments did not meet a listing.

### 2. Mental Disorders, Listings 12.03, 12.04, 12.06, 12.08, and 12.15

The Mental Disorders Listings include eleven categories, and each category of disorders contains criteria listed in either two paragraphs, A and B, or three paragraphs, A, B, and C. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00A.1, 2. To satisfy any of the Mental Disorders Listings, the claimant's mental disorder must satisfy the criteria of both paragraphs A and B or A and C. *Id.* § 12.00A.2. Listing 12.08, personality and impulse-control disorders, contains only A and B criteria, while Listings 12.03, schizophrenia spectrum and other psychotic disorders; 12.04, depressive, bipolar and related disorders; 12.06, anxiety and obsessive-compulsive disorders; and 12.15, trauma- and stressor-related disorders contain A, B, and C criteria. *Id.* The A criteria are unique to each listing, but the B and C criteria are identical for each listing at issue here. *Id.* § 12.00A.2.a–c.

The "B criteria" assess how the claimant's mental disorders limit functioning measured in four functional areas: understand, remember, or apply information; interact with others;

19

concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* § 12.00A.2.b. To satisfy

the B criteria, a claimant must demonstrate extreme limitation of one, or marked limitation of two,

of the four functional areas. *Id.* A "mild limitation" means functioning is "slightly limited," a

"moderate limitation" means functioning is "fair," a "marked limitation" means functioning is

"seriously limited," and an "extreme limitation" means an inability to function. *Id.* § 12.00F.2.

The "C criteria" are used to evaluate "serious and persistent" disorders and are satisfied

where (1) there is a medically documented history of the mental disorder for at least two years; (2)

"the evidence shows that [the claimant] rel[ies], on an ongoing basis, upon medical treatment,

mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the

symptoms and signs of [the] mental disorder;" and (3) "the evidence shows that, despite [the

claimant's] diminished symptoms and signs, [the claimant] ha[s] achieved only marginal

adjustment," i.e., "adaptation to the requirements of daily life is fragile; that is, [the claimant] ha[s]

minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not

already part of [the claimant's] daily life." *Id.* § 12.00A.2.c, G.2.

The ALJ, in considering whether Claimant met Listings 12.04 or 12.06, considered

Claimant's mental impairments, singly and in combination, and found that they failed to satisfy

the paragraph B or C criteria. (R. 60–61). In considering the B criteria, the ALJ specifically found

that Claimant's mental impairments resulted in mild limitations in understanding, remembering,

or applying information and adapting and managing oneself and moderate limitations in

concentrating, persisting, or maintaining pace and interacting with others. *Id.* The ALJ noted that

on one occasion Claimant's memory was described as abnormal but that it was generally described

as good or intact; she was able to manage her finances and health care; she could drive short

distances; she testified it was hard for her to be in public because she feels nervous and

20

apprehensive around strangers, but a treatment note indicated she did not go out for fear of falling; she described herself as angry, but records from LeChris described her as friendly; it was reported she regularly visits the public library, and she interacts with individuals she is familiar with and shops on a weekly basis; she can prepare simple meals; and she generally had no difficulties interacting with her treatment providers and demonstrated appropriate grooming. (R. 60–61). In summary, while the ALJ found that Claimant was limited in the four domains constituting the B criteria, he concluded her limitations were not marked or extreme, and thus, the B criteria were not satisfied. The ALJ correctly applied the law and provided substantial evidence for his conclusion that the B criteria were not satisfied, and the fact that Claimant can point to other evidence that supports her position does not render the ALJ's decision unsupported. *See Johnson v. Colvin*, No. 4:15-CV-147-F, 2016 WL 11430306, at *7 (E.D.N.C. Aug. 25, 2016) (citing *Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012); *Mastro*, 270 F.3d at 176 (citing *Craig*, 76 F.3d at 589)), *adopted by* 2016 WL 4995068 (E.D.N.C. Sept. 19, 2016).

As for the C criteria, the ALJ found that Claimant had not demonstrated "marginal adjustment" where the records showed she received little treatment for her mental impairments prior to her DLI, she required no psychiatric hospitalizations, she was able to manage her funds and live on her own, and she reported in July 2017 that she cared for her father. (R. 61). Claimant contends that the ALJ misinterpreted the treatment notes indicating she would not act on her suicidal thoughts because she "cares" for her father. The ALJ interpreted "cares" as physically assisting her father, while the Claimant argues she meant that she emotionally cares for him and did not want to put him through the pain of her committing suicide. Pl.'s Mot. [DE-26] at 7–8; (R. 663–65). Even assuming the ALJ misinterpreted Claimant's statement about caring for her father, the other reasons given by the ALJ are sufficient to sustain his conclusion that Claimant's mental

21

impairments were not severe enough to satisfy the C criteria. *See Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) ("Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. It consists of more than a mere scintilla of evidence but may be less than a preponderance.") (citation and internal quotation marks omitted).

The ALJ's determination that Claimant's mental impairments did not satisfy the B and C criteria as to Listings 12.04 and 12.06 also preclude any argument that her impairments satisfy Listings 12.03, 12.08, and 12.15 because they share the same either B or C criteria. Therefore, any error by the ALJ in failing to consider those listings is harmless. *See Johnson*, 2016 WL 11430306, at *7 (finding failure to consider Listing 12.08 was harmless given that the B criteria analyzed by the ALJ in the context of Listing 12.04 also applied to Listing 12.08) (citation omitted); *see also Chaple v. Astrue*, No. 5:11-CV-61-D, 2012 WL 937260, at *2 (E.D.N.C. Mar. 20, 2012) ("[A]lthough the ALJ should 'identify the relevant listings and . . . explicitly compare the claimant's symptoms to the requirements[,] . . . [m]eaningful review may be possible even absent the explicit step-by-step analysis . . . where the ALJ discusses in detail the evidence presented and adequately explains his consideration thereof." (quoting *Johnson v. Astrue*, No. 5:08-CV-515-FL, 2009 WL 3648551, at *2 (E.D.N.C. Nov. 3, 2009)). Accordingly, the ALJ did not err in finding Claimant's mental impairments did not meet a listing.

**D.    The ALJ's RFC Determination**

Claimant contends that in formulating her RFC, the ALJ improperly weighed opinion evidence from her treatment providers and improperly assessed her testimony. Pl.'s Mot. [DE-26] at 8–12, 17. An individual's RFC is the capacity she possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); *see also* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "[T]he residual functional capacity 'assessment must first identify

22

the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 404.1545(a)(3); *see also* S.S.R. 96-8p, 1996 WL 374184, at *5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Brown*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ, and the ALJ also discusses a claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 WL 374184, at *7. The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*; *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

### 1. Medical Opinion Evidence

When assessing a claimant's RFC, the ALJ must consider the opinion evidence. 20 C.F.R. § 404.1545(a)(3). Regardless of the source the ALJ must evaluate every medical opinion received.

23

*Id.* § 404.1527(c).[4]  In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources such as consultative examiners. *Id.* § 404.1527(c)(2).

When the opinion of a treating source regarding the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" it is given controlling weight. *Id.* However, "[i]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527).

Claimant contends the ALJ erred in affording no weight to the opinions of Amanda Styron, M.S. and Donna Shelton, P.A.C. Pl.'s Mot. [DE-26] at 8–17. The ALJ evaluated these opinions as follows:

> As for the opinion evidence, Amanda Styron, M.S., completed a mental residual functional capacity statement on June 23, 2017. Ms. Styron opined that the claimant has marked limitations in understanding, remembering or applying information, difficulties with adapting or managing oneself, and difficulties with concentrating persistence or maintain pace. It was noted that the claimant's ability to interact with

---

[4] The rules for evaluating opinion evidence for claims filed after March 27, 2017 are found in 20 C.F.R. § 404.1520c, but 20 C.F.R. § 404.1527 still applies in this case.

24

others was extremely limited. She concluded that the claimant would miss 4 or more days from work. Little weight has been given to this assessment, which was made based on treatment after the claimant's date last insured and overstates the claimant's limitations. Specifically, the marked and extreme limitations suggest the need for hospitalization, which has not occurred here. The marked limitation to adapt or manage oneself is not consistent with the claimant's report from July 20, 2017, that she cares for her father. Additionally, while treatment records from Port Health Services indicate reports of daily panic attacks, paranoia, visual hallucinations and audio hallucinations, these are not consistent with her presentations to Le Chris Counseling or other sources throughout the record. Moreover, during a psychiatric evaluation from December 20, 2016, it was noted that there was "much vagueness, possible over-reporting of symptoms with histrionic undertones" it was also noted that there were possible "secondary gain issues based on pending disability case". The longitudinal medical record simply does not support that the claimant is so limited and little weight has been assigned to this opinion. (Exhibits 12F and 15F).

Donna L. Shelton, P.A.C., completed a mental residual functional capacity statement on June 23, 2017. She concluded that the claimant has severe "psych-social limitations". There was no opinion formed as to how this severe limitation or any of the claimant's other mental symptoms limit her ability to perform mental work related tasks. Because there was no substantive opinion of the claimant's functional limitations, no weight as been given to Ms. Shelton's statement. (Exhibits 11F, 16F, and 17F).

(R. 66).

The ALJ accurately noted that Shelton did not indicate how Claimant's impairments limited her functional ability and instead referred to the "therapist's form," which appears to be a reference to Styron's opinion. (R. 66, 557–64). The ALJ is entitled to discount the weight of an opinion that lacks explanation. *See Dunn v. Colvin*, 607 F. App'x 264, 268 (4th Cir. 2015) ("[T]he more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given.") (citation omitted); *Vanderpool v. Berryhill*, No. 5:18-CV-44-RJ, 2019 WL 118414, at *5 (E.D.N.C. Jan. 7, 2019) (holding that an ALJ did not err in giving a medical opinion partial weight because the limitations in the opinion were vague and the doctor failed to provide a function-by-function assessment); *Carlton v. Astrue*, No. 5:06-CV-

25

372-FL, 2008 WL 681184, at *10 (E.D.N.C. Mar. 7, 2008) (upholding an ALJ's rejection of a medical opinion on the grounds that the opinion did not include a function-by-function analysis and was not supported by treatment notes). Accordingly, the ALJ's decision to discount Shelton's opinion is sufficiently explained and supported by substantial evidence.

The ALJ discounted Styron's opinion because it was based on treatment after Claimant's date last insured and it overstated her limitations. (R. 66). Styron, who treated Claimant at PORT, issued her opinion several months after Claimant's September 30, 2016 date last insured. In response to a question regarding the onset date of Claimant's functional limitations, Styron indicated she could not report on anything prior to when she first treated Claimant in December 2016. (R. 572). Claimant was treated at LeChris during the relevant period for adjustment disorder with mixed anxiety and depressed mood, and she did not report symptoms that would result in the marked or extreme limitations suggested by Styron until after her DLI when she moved her care to PORT. (R. 65–66). As discussed above, the ALJ sufficiently explained why he found Claimant's post-DLI presentation at PORT to be inconsistent with her presentation during the relevant period at LeChris. *Id.* It is also noteworthy that in a December 13, 2017 diagnostic assessment note provided to the court by Claimant, Stryon rated Claimant's functional status as "mild impairment" when evaluating Claimant's recommended level of care. [DE-5-2] at 43.

The ALJ also cited Claimant's ability to care for her father in discounting Styron's opinion that Claimant had marked limitations in adapting and managing oneself. (R. 66). As discussed above, even if the ALJ misinterpreted Claimant's statements in this regard, the other evidence discussed by the ALJ is sufficient to support his evaluation of Stryon's opinion. For example, in addition to the LeChris records, the ALJ cited Dr. Rose's treatment note from PORT questioning whether Claimant's reported symptoms were as severe as alleged. (R. 66). The ALJ noted Dr.

26

Rose's statement that "during a psychiatric evaluation from December 20, 2016, it was noted that there was 'much vagueness, possible over-reporting of symptoms with histrionic undertones'[;] it was also noted that there were possible 'secondary gain issues based on pending disability case.'" (R. 66, 667–70). Dr. Rose also noted that Claimant reported being "very paranoid" but described no true or typical paranoia when providing examples, and he indicated malingering should be ruled out. (R. 667–70). However, Claimant elected to stop seeing Dr. Rose because they did not "click," and she felt more comfortable with Donna Shelton. (R. 102). "An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up ' specious inconsistencies,' or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn*, 607 F. App'x at 267 (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). The ALJ's decision to discount Stryon's opinion is sufficiently explained and supported by substantial evidence.

### 2. Claimant's Testimony

When assessing a claimant's RFC, it is within the province of the ALJ to determine whether a claimant's statements are consistent with the medical and other evidence. *See Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.") (citation omitted). Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593–94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016); *Hines v. Barnhart*,

27

453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes that determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 16-3p, 2016 WL 1119029, at *4; *Hines*, 453 F.3d at 564–65.

Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors concerning the "intensity, persistence and limiting effects" of the claimant's symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c)(3) (showing a complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence, *Craig*, 76 F.3d at 595–96, but neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ must "evaluate whether the statements are consistent with objective medical evidence and the other evidence." S.S.R. 16-3p, 2016 WL 1119029, at *6; *see Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at *4–8 (E.D.N.C. Mar. 23, 2011), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

Claimant contends the ALJ's decision is contradicted by her testimony. Pl.'s Mot. [DE-26] at 17. The ALJ summarized and evaluated Claimant's testimony as follows:

> The claimant testified that her alleged onset date is when her mother died. She said she lost her job and her mind cracked. She reported experiencing breakdowns with sleep interruptions, depression, and anxiety. The claimant testified that her past jobs caused her to experience panic attacks. During a panic attack, she feels hot, nauseas, and her legs shake. She endorsed feeling insecure, nervous, and apprehensive around people she does not know. The claimant said it is hard for her to go into public places. The claimant rated the depression as 9, both with and without psychotropic medication. Anxiety was rated as 8 to 9. Anxiety was triggered by anything related to her employment. She has never been hospitalized for emotional reasons.

28

The claimant endorsed various musculoskeletal complaints during her testimony including pain to her back, knees, and abdomen. She said since her motor vehicle accident she experiences muscle spasms. The claimant also reported that she experiences pain so severe that it has caused her to pass out. The claimant presented at the hearing with a surgical walker. She reported that she has used it continuously since 2015 due to knee pain.

Considering the claimant reported functional limitations throughout the record, the undersigned concludes they fall into one of two broad categories. The first is that the functional limitations are imposed by the severe medically determinable impairments. The other is that they are adopted as a matter of convenience to the claimant.

The undersigned acknowledges that healthcare providers maintain records for treatment purposes, rather than to serve as evidence in legal proceedings. But when medical evidence is considered on a longitudinal basis, impairments that impose exceptional functional limitations leave some footprint in the treatment record. This may consist of the claimant discussing the symptoms with a healthcare provider, or in the form of clinical observations, test results, and imaging. It is for that reason that the undersigned has compared the claimant's statements, oral and documentary, with the whole of the medical evidence to determine the severity of limitations imposed by medically determinable impairments, as well as the effectiveness of treatment.

After consideration of the claimant's statements throughout the record, both documentary and oral, the undersigned finds that the claimant is not fully consistent with the evidence. Although the claimant has described activities that are fairly limited, it is difficult to attribute that degree of limitation to the claimant's medical condition in view of the medical evidence discussed in this decision.

While the claimant's medically determinable impairments could reasonably be expected to cause in general the alleged symptoms and limitations, the extent of those symptoms and limitations are not supported by medically acceptable clinical and diagnostic techniques. Neither are the symptoms and limitations described by the claimant supported by the pertinent signs and laboratory findings in the records of the treating and examining healthcare professionals. Further, there is insufficient objective medical evidence that the impairments were of such severity that they could have reasonably have been expected to give rise to the limitations the claimant asserts.

(R. 62–63) (internal footnotes omitted).

In assessing Claimant's musculoskeletal complaints and related pain, the ALJ considered

Claimant's testimony in light of the treatment notes and imaging. As discussed above, the ALJ

29

noted findings on imaging were relatively mild and not acute; Claimant was not a surgical candidate and physical therapy was recommended, but she missed physical therapy appointments at times and declined physical therapy on another occasion; and there are references throughout the record that Claimant's complaints exceeded objective evidence and her physical examinations were largely normal, including a November 24, 2014 treatment note indicating Claimant was non-compliant with the examination and continued to claim symptoms inconsistent with objective findings, a December 2015 treatment note stating that there were "no 'red flags' or imaging findings that would explain her complaints of pain over entire body," and a January 2017 treatment note stating Claimant had minimal diagnostic findings and she had not tried many conservative options. (R. 41, 64–65, 331–35, 431, 590, 602–16). The ALJ also discussed Claimant's use of a walker, noting that although Claimant testified she began using a walker in 2015, (R. 63, 94), there is no evidence in the record indicating Claimant used or needed a walker prior to her September 30, 2016 DLI. (R. 65, 67–68, 449, 547, 582, 585).

In assessing Claimant's mental impairments, as discussed at length above, the ALJ found that treatment records from LeChris during the relevant period did not reflect the level of impairment Claimant reported at the hearing. (R. 65–66). The ALJ also cited evidence in the record suggesting that Claimant exaggerated her symptoms once she moved her care to PORT in order to bolster her disability application. *Id.* The ALJ did not completely discount Claimant's testimony. He acknowledged her depression and anxiety and imposed restrictions in the RFC to accommodate her resulting moderate limitations in concentration, persistence, and pace and social functioning. (R. 67).

The ALJ applied the correct legal standards in weighing conflicting evidence in the record regarding Claimant's limitations from her impairments, he sufficiently explained his determination

30

regarding Claimant's subjective complaints, and he cited substantial evidence in support of his decision. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.") (brackets, citation, and internal quotation marks omitted). Accordingly, the ALJ did not err in discounting Claimant's testimony.

## VI. CONCLUSION

For the reasons stated above, Claimant's Motion for Judgment on the Pleadings [DE-26] is DENIED, Defendant's Motion for Judgment on the Pleadings [DE-27] is ALLOWED, and the final decision of the Commissioner is affirmed.

SO ORDERED, the 9th day of July 2020.

Robert B. Jones, Jr.
United States Magistrate Judge

31